UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| KARMEN LEE DAVIS,        ) | |
|        ) | |
|      Plaintiff,        ) | |
|        ) | |
|    v.        ) | No. 2:18 CV 318 |
|        ) | |
| ARCELORMITTAL USA, LLC,        ) | |
|        ) | |
|      Defendant.        ) | |

**OPINION and ORDER**

This matter is before the court on defendant's motion for summary judgment. (DE # 31.) For the reasons that follow, defendant's motion will be granted in part and denied in part.

**I.      BACKGROUND**

This employment discrimination case arises from plaintiff Karmen Lee Davis' employment with defendant ArcelorMittal USA, LLC. Plaintiff is currently employed by defendant in defendant's steel-making facility. (DE # 33-1 at 3; DE # 33-3 at 4.) Plaintiff began working for defendant in March 2013 as a Utility Person. (DE # 33-2 at 6.) She subsequently performed tagger, hot metal helper, and then hot metal pourer tasks. (*Id.* at 7.)

Defendant's employees, including plaintiff, are part of the United Steel Workers Union. (DE # 33-3 at 1.) The union has negotiated a collective bargaining agreement (CBA) with defendant. (*Id.*) The CBA lists seven covered jobs with defendant, divided by five labor grades, and each job has a specific set of tasks that an employee could be

assigned to perform. (*Id.* at 2.) The CBA contains rules requiring that defendant consider the seniority of employees when granting job requests and transfers. (*Id.* at 1.)

In June 2014, while plaintiff was working as an Operating Technician performing hot metal pourer tasks, she fell into a pit and sustained injuries. (DE # 33-2 at 7-8.) Plaintiff took medical leave and returned to work in July 2014. (DE # 33-1 at 4.) Plaintiff was able to return to work, but under several medical restrictions. (DE # 33-2 at 90-91.) The parties do not dispute that defendant accommodated these restrictions, which changed over time, for the next several years, until mid-2017. During this time, plaintiff was assigned to perform scrap inspector tasks in the No. 2 Steel Producing area (2SP), a desk job role in which she checked scrap trucks into the facility and reviewed scrap over a camera. (*Id.* at 9-10.) Plaintiff continued to be paid at the higher rate of an Operating Technician performing hot metal pourer tasks, rather than the lower rate for a Service Technician performing scrap inspection tasks. (*Id.* at 10; DE # 33-3 at 2.)

During a safety training in 2016, a union leader running the training brought up plaintiff's accident (without mentioning her by name) and showed footage of the department where her accident occurred. (DE # 33-2 at 15.) This caused plaintiff to have a panic attack. (*Id.*) After the incident, plaintiff spoke with her supervisor John Martinez. (*Id.* at 15-16.) Martinez told her, "[w]ell, you're required to go to those. You're just crazy." (*Id.* at 16.) Plaintiff claims that Martinez knew that she experienced mental distress resulting from her accident because – within a year of the accident – she told him that she could not go back on the production floor. (*Id.*) After her panic attack

2

during the training, Martinez would periodically come into the trailer where she worked and tell plaintiff that he was going to put her back on the production floor. (*Id.*)[1]

After the safety training incident, plaintiff went to a psychologist to get updated work restrictions. (*Id.* at 17.) Plaintiff's psychologist wrote plaintiff a letter to provide to defendant, stating that plaintiff has Post Traumatic Stress Disorder (PTSD) as a result of her work accident, which manifests as severe anxiety symptoms. (*Id.* at 98.) The letter states that plaintiff would have a great deal of difficulty participating in situations or activities where she would be reminded of her accident, hear about others experiencing similar accidents, or be in a space with too much stimulation by noise, others moving, physical stimulation, etc. (*Id.* at 17, 98.)

In May 2017, defendant closed the entire 2SP area, eliminating all 2SP positions, including plaintiff's position. (*Id.* at 12.) The 2SP employees were allowed to bid for other positions before 2SP closed. (*Id.* at 13.) Plaintiff submitted bids for two positions. (*Id.*) However, she did not receive either position. (*Id.*) She was not chosen for one of the positions because the chosen employee had more seniority, and she was not chosen for the second position because she failed the computer test. (*Id.*)

Plaintiff claims that there was an unbiddable, but available, scrap inspector position in the No. 4 Steel Producing (4SP) facility. (*Id.* at 24-25.) Defendant responds

---

[1] Plaintiff attempts to create a question of fact regarding Martinez's statements, through an affidavit attached to her response to the motion for summary judgment. For the reasons discussed later in this Opinion and Order, the court disregards all statements in plaintiff's affidavit that contradict her deposition testimony. Accordingly, the contradictory facts are not included in this recitation of the facts.

that it does not have a "scrap inspector" position; rather, scrap inspector tasks are performed by a Service Technician. (*See* DE # 33-3 at 128.) Plaintiff asked Martinez about the 4SP position, but Martinez chose another employee, Karen Johnson, for that position. (DE # 33-2 at 25; DE # 33-3 at 2.) Plaintiff claims that Martinez chose Johnson for the role, over plaintiff, because he was friends with Johnson. (DE # 33-2 at 25.) According to defendant, Johnson was selected for the role because she placed a bid for the 4SP Service Technician position and she had more seniority than plaintiff, so the CBA required that Johnson receive the position. (DE # 33-3 at 2-3.)

Defendant ultimately placed plaintiff in a Labor Utilities position in 4SP. (DE # 33-2 at 13.) On June 5, 2017, her first day in the new role, plaintiff had an episode during orientation and safety training and could not go into the shop or onto the plant floor. (*Id.* at 13.) However, as of that date, she did not have any restriction preventing her from working in the production area. (*Id.* at 17-18.)[2]

Plaintiff went to defendant's clinic and told them that she had not been able to go onto the production floor. (*Id.* at 18-19.) She was given a temporary restriction for

---

[2] At the time of this incident, plaintiff's permanent medical restrictions precluded her from lifting more than 30 pounds, performing repetitive overhead work, and prolonged walking. (DE # 33-2 at 97.) Furthermore, plaintiff's psychologist's letter stated that plaintiff "will have great difficulty participating in situations/activities where she would be reminded of her work accident, hear about others experiencing similar work-related issues, near death experiences, mental trauma, be in a space with too much stimulation by noise, others moving, physical stimulation, etc. In these instances, accommodations may be needed as continuous discussions/re-experiencing issues related to the above may overwhelm and exacerbate her symptoms and future adjustment." (*Id.* at 17, 98.)

4

"office work only." (*Id.* at 99.) Jennifer Spiegel in Human Resources told plaintiff that she needed to get an updated restriction from the doctor treating her PTSD. (*Id.* at 18, 20.) Plaintiff claims that Spiegel initially commented that plaintiff's PTSD "didn't count" as a medical disability, but plaintiff also agreed that Spiegel told her to get an updated restriction from her doctor, restricting her from working on the production floor. (*Id.* at 23-24, 39-40.) Ultimately, plaintiff provided updated restrictions from her psychologist and defendant implemented the updated restrictions. (*Id.* at 40.)

Plaintiff's updated restrictions barred her from going to, or working inside of, the plant. (*Id.* at 19, 100.) However, almost every union position was inside the plant. (*Id.* at 19.) In fact, plaintiff's earlier position performing scrap inspector duties in 2SP was inside the plant. (*Id.*) The only positions that plaintiff was aware of that were outside of the plant were research positions. (*Id.*)

Plaintiff received the updated restrictions on June 12, 2017. (*Id.*) Shortly thereafter, she discussed the updated restrictions with Spiegel, Ron Allen – another human resources employee, and union representatives. (*Id.* at 19-20.) Plaintiff asked whether she could perform scrap inspector tasks in 4SP, but the Service Technician job in that area was already filled by Johnson – an employee with more seniority, and was located inside the plant and therefore would not be compatible with her restrictions. (*Id.* at 20, 26, 39; DE # 33-3 at 2-3.) Defendant told plaintiff that it could not accommodate her, due to her restriction preventing her from going inside the plant. (DE # 33-2 at 20.)

Plaintiff believed that the restriction barring her from entering the plant was too restrictive. (*Id.*)

On June 13, 2017, the day after plaintiff received the initial updated restriction from her psychologist restricting her from entering the plant, the company that administers benefits for defendant received an application from plaintiff for Sickness and Accident (S&A) leave. (*Id.* at 21.) Plaintiff's request was approved. (*Id.*) While plaintiff was on leave, she received 70% of her base pay for a forty-hour workweek. (*Id.*) Plaintiff was on S&A leave from June 2017 until June 2018. (*Id.* at 21, 31.) It is not clear whether plaintiff's request for S&A leave was made before or after her meeting with Spiegel, Allen, and the union representatives.

On August 8, 2017, plaintiff received an updated assessment from her psychologist. (*Id.* at 20.) However, this updated assessment still barred her from entering the plant. (*Id.*) Plaintiff's permanent medical restrictions were updated on August 31, 2017, to include a restriction barring her from going to, or working inside of, the plant. (*Id.* at 20-21.)

In September 2017, while plaintiff was on leave, defendant sent plaintiff a letter confirming that her permanent restrictions might prevent her from performing the full scope of her assignments as a Utility Person in the 4SP department. (*Id.* at 21, 107.) The letter invited plaintiff to a meeting to discuss how her restrictions might affect her ability to perform the essential functions of her job. (*Id.* at 107.) Plaintiff met with Spiegel, Allen, and a union representative. (*Id.* at 22.) After that meeting, plaintiff told

6

her psychologist that the restrictions were too limiting because "every job is in the plant" and her psychologist revised the restriction. (*Id.*) The revised restriction stated that plaintiff "may not work directly in the industrial setting or on a production line/floor. She may, however, work in a similar or adjacent job as that which she had been placed on after the trauma, for example, 'Scrap inspector,' – a job that was located inside of the plant, yet, away from the aforementioned triggering experiences." (*Id.* at 22, 108.) Defendant then updated plaintiff's permanent restrictions to: "1) lifting >30 #; 2) repetitive overhead work; 3) prolonged walking; 4) working directly on the industrial production line/floor." (*Id.* at 109.)

While she was on S&A leave, plaintiff filed a grievance asking for a scrap inspector position in 4SP. (*Id.* at 23, 110.) However, the 4SP Service Technician position responsible for scrap inspector tasks had already been assigned to Karen Johnson. (DE # 33-3 at 2-3.) Moreover, unlike the 2SP scrap inspector role she had before (a desk job with no climbing, lifting, walking, and not on the production floor) the 4SP scrap inspector role required moving empty pallets off the floor with a forklift, daily walking throughout the shift in a yard made up of dirt and debris, and proximity to moving equipment like cranes and trucks. (DE # 33-2 at 25-26.) The union looked for other positions for plaintiff. (*Id.* at 26.)

Meanwhile, in November and December of 2017, while plaintiff was still on leave, plaintiff and Allen were in contact about potential positions for plaintiff. (*Id.* at 27-28, 112-114.) Defendant offered plaintiff different options, trying to find an area

where she could work. (*Id.* at 112-114.) Upon Allen's suggestion, plaintiff visited the 2SP area, but it brought back unpleasant memories, so Allen suggested that plaintiff visit the East Finishing department, to see if a position there might work for her. (*Id.* at 113.) He also suggested that she might want to take the test for a clerical position. (*Id.*) He gave her the date for the test, but plaintiff did not appear for the test, so Allen wrote her to say that he assumed that she was not interested in the position. (*Id.* at 112.)

In February 2018, while plaintiff was still on leave, plaintiff went to defendant's clinic and her restrictions remained the same. (*Id.* at 29, 115-116.) The clinic cleared her to go back to work, but said that she needed to be in touch with Allen about a position. (*Id.* at 116.) Allen then wrote to plaintiff, stating that he still had not heard from her, and asked her to contact him. (*Id.* at 117.) Plaintiff responded and asked for dates for the next clerical test. (*Id.* at 118.) Allen responded that the dates were flexible, and repeated that he would like her to walk through the East Finishing department. (*Id.*)

In April 2018, plaintiff received notice that her leave would run out in June 2018, and that she needed to contact the defendant to discuss her return to work. (*Id.* at 119.) Allen and plaintiff were in contact again in June to discuss her walkthrough of the East Finishing department. (*Id.* at 124-125.)

In July 2018, the union inquired into a janitorial position for plaintiff. (*Id.* at 33.) However, that position is not staffed by defendant's employees, but rather contracted out to a third party. (*Id.*) In August 2018, plaintiff expressed interest in a slab cutter position. (*Id.*) However, that position was going to be eliminated. (*Id.*)

In August 2018, Allen wrote to plaintiff about two possible positions that he believed met her restrictions. (*Id.* at 126.) In September 2018, plaintiff responded that she believed the positions violated her restrictions. (*Id.* at 127.) Plaintiff instead expressed an interest in a scrap crane operator position. (*Id.*) Allen responded in October 2018, seeking clarification as to whether plaintiff's restrictions had changed, and inviting plaintiff to contact him if she would like to discuss any positions that she had reviewed. (*Id.* at 128.) Plaintiff inquired again about the Scrap Crane Operator position. (*Id.* at 133.) Allen said that the position was still open, that defendant believed it was a reasonable accommodation, and that she could have the position if she wished. (*Id.* at 132.)

In November 2018, plaintiff received a release to return to work as a Scrap Crane Operator, and she returned to work. (*Id.* at 38, 134.) Plaintiff is currently employed by defendant as an Office and Technical Counsel Operator. (DE # 33-3 at 3.)

Plaintiff's amended complaint alleges that defendant discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111, *et seq.* (DE # 16.) Defendant now moves for summary judgment on all of plaintiff's claims. (DE # 31.) This matter is fully briefed and is ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

III.    **ANALYSIS**

A.    *Plaintiff's Affidavit*

As a preliminary matter, the court must address plaintiff's affidavit, submitted with her response to the motion for summary judgment. (DE # 36-1.) Defendant argues that certain statements in plaintiff's affidavit must be disregarded on the basis that they directly contradict plaintiff's deposition testimony, and plaintiff may not defeat summary judgment through the submission of a "sham" affidavit. (DE # 37 at 7.)

"The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). Federal Rule of Civil Procedure 56 has two specific provisions that serve this screening function. *Id.* First, Rule 56(c)(4) permits a party to use an affidavit or declaration to support or oppose a motion for summary judgment only if the affidavit (1) attests to facts of which the affiant has "personal knowledge;" (2) "set[s] out facts that would be admissible in evidence;" and (3) "show[s] that the affiant or declarant is competent to testify on the matters stated." Second, Rule 56(h) permits a judge to sanction a party who presents an affidavit "in bad faith or solely for delay." "Rule 56 thus requires a judge to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains." *James*, 959 F.3d at 315.

"In furtherance of this screening function and in support of a judge's duty at the summary-judgment stage, every federal court of appeals permits a judge to disregard a

11

'sham' affidavit—typically an affidavit that contradicts prior deposition testimony." *Id.*

"In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit

that contradicts the party's prior deposition or other sworn testimony." *Id.* at 316. "The

organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of

material fact cannot be conjured out of nothing." *Id.* (emphasis in original).

 The Seventh Circuit has recognized three exceptions to the sham-affidavit rule.

*Id.* at 317. First, "[a]n affidavit that contradicts prior testimony but contains newly

discovered evidence is allowed." *Id.* Second, "because a deponent may be confused by a

question and his memory may fail, a judge may also consider an affidavit that

contradicts a statement in a deposition if the statement is demonstrably mistaken." *Id.*

Third, a judge may consider "the submission of a supplemental affidavit that clarifies

ambiguous or confusing deposition testimony." *Id.*

 In her affidavit, plaintiff makes several claims that directly contradict her

deposition testimony. Plaintiff then attempts to use these statements to create a question

of material fact to preclude the entry of summary judgment.

 First, in her affidavit, plaintiff claims that during the 2016 training session,

Martinez disclosed plaintiff's PTSD diagnosis to the training class and called her crazy,

causing her to suffer a breakdown during the training class. (DE # 36-1 at 1.) Plaintiff

alleges that, at the time of this incident, defendant's clinic had knowledge of plaintiff's

PTSD diagnosis. (*Id.* at 2.) Plaintiff cites this incident in her response to the motion for

summary judgment as evidence of discriminatory harassment that precludes the entry

of summary judgment. (DE # 36 at 5.) However, during her deposition, plaintiff

testified that it was an unidentified union leader – not Martinez – who brought up her

accident, and that she was not mentioned by name. (DE # 33-2 at 15.) She testified that

*after* the training, she spoke with Martinez, who told her, "[w]ell, you're required to go

to those. You're just crazy." (*Id.* at 15-16.) Plaintiff testified that as a result of the incident

during the training she went to defendant's clinic to get an actual diagnosis from the

company psychiatrist and later her own psychologist. (*Id.* at 17.)

Second, in her affidavit, plaintiff alleges that defendant "arbitrarily decided as of

August 31, 2017" that she "could not work anywhere except for the administrative

building" and so she was forced to go on S&A leave. (DE # 36-1 at 3-4.) Plaintiff cites

these statements as evidence that defendant's stated reasons for transferring plaintiff

from her scrap inspector duties in 2017 was pretext for disability discrimination. (DE #

36 at 8-9.) However, during her deposition, plaintiff agreed that she applied for S&A

leave as of June 13, 2017 – shortly after her psychologist imposed an additional

restriction preventing her from going inside the plant. (DE # 33-2 at 21.) Plaintiff

testified that after she went on S&A leave, she spoke to her psychologist about revising

the restriction because "every job is in the plant" and the restriction was too restrictive.

(*Id.* at 22.)

The court finds that these statements from plaintiff's affidavit directly contradict

her deposition testimony, and therefore should not be considered in ruling on the

motion for summary judgment. Plaintiff has not argued that any of the recognized

exceptions to the sham-affidavit rule apply, and has provided no other explanation for the contradictions. *See Abraham v. Washington Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) ("[A] deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies."). The contradictions in plaintiff's affidavit do not concern minor details – they go to the very crux of her claims of harassment, discrimination, and accommodation. Accordingly, these inconsistent statements will not be considered.[3]

    B.    *Motion to Strike*

Plaintiff has moved to strike the affidavit of Ron Allen that defendant attached to its reply brief. (DE # 38.) Plaintiff argues that the court should strike this evidence because there is nothing in Federal Rule 56 or Local Rule 56-1 that permits a party to submit affidavits or new evidence with a reply brief. Plaintiff contends that permitting defendant to introduce this evidence would leave her with no way to respond because the local rules make no mention of sur-replies or counter-affidavits.

There is no prohibition against filing additional affidavits with a reply brief, so long as the new affidavits merely respond to matters placed at issue by the response

---

[3] Plaintiff counsel's disregard for legal rules and procedures is not limited to plaintiff's sham affidavit. Plaintiff's response brief lacks a section labeled "Statement of Genuine Disputes" that identifies the material facts that plaintiff contends are genuinely disputed so as to make a trial necessary – as is required under the Local Rules. N.D. Ind. L.R. 56-1. Plaintiff's response brief generally lacks citation to the record, in violation of Federal Rule of Civil Procedure 56(c). Moreover, plaintiff's brief contains almost no citation to legal authority. Counsel is cautioned that similar filings before this court in the future may be summarily stricken.

brief, and do not raise new arguments in favor of granting summary judgment. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 318 (7th Cir. 2003), *as amended* (May 22, 2003) ("There is no blanket prohibition from filing additional affidavits when a movant for summary judgment files a reply brief following a nonmovant's response."); *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134, n.* (7th Cir. 1996) ("'[W]here the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues.'" (quoting *Baugh v. City of Milwaukee*, 823 F.Supp. 1452, 1457 (E.D.Wis. 1993), *affirmed*, 41 F.3d 1510 (7th Cir. 1994))).

Here, Allen's affidavit merely responds to information contained in the affidavit of Trent Briner, attached to plaintiff's response brief. Briner's affidavit stated that he observed a new hire, Scott Moore, being trained in 2018 to perform scrap inspector duties in 4SP. (DE # 36-3.) The Allen affidavit explains that Moore was merely training in 2018 so that he could occasionally fill in for Johnson when she was called away for other duties. (DE # 37-1.) Allen's affidavit was submitted only to provide additional information, not to advance a new argument, and therefore it was properly submitted. The motion to strike will be denied. The court notes that if plaintiff wished to file a sur-reply, she was free to seek leave to do so.

C.    *Motion for Summary Judgment*

    1.    <u>Failure to Accommodate</u>

To prevail on a failure to accommodate claim under the ADA, a plaintiff must prove that: (1) she was a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate her disability. *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019). "Relevant to—and sometimes determinative of—the third element is the employer and employee's respective cooperation 'in an interactive process to determine a reasonable accommodation.'" *Id.* (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)).

"The duty to reasonably accommodate a disabled employee may require a reassignment to a vacant position." *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021) (citing 42 U.S.C. § 12111(9)(B)). The plaintiff bears the burden of establishing that there was a vacant position for which she was qualified. *Id.* at 1262; *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017).

Disagreement with an employer's reasonable accommodation under the ADA cannot defeat summary judgment. *Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, No. 18-3351, — F.3d —, 2021 WL 613425, at *9 (7th Cir. Feb. 17, 2021). "'[I]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests.'" *Id.* at *8 (quoting *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000)).

In this case, defendant does not contest that plaintiff was a qualified individual with a disability, nor does it contest that it knew of plaintiff's disability. The only question is whether defendant failed to accommodate plaintiff's disability. The gravamen of plaintiff's accommodation claim is that defendant did not place her in the Service Technician job in 4SP that is responsible for scrap inspection duties, after her position performing scrap inspection duties in 2SP was eliminated. (DE # 36 at 8-9.) She also claims that she was forced to take S&A leave because defendant did not provide her with the scrap inspector position. (*Id.* at 9.)

The undisputed evidence demonstrates that defendant is entitled to summary judgment on plaintiff's accommodation claim. While plaintiff argues that defendant should have provided her with the Service Technician position in 4SP in May 2017 when 2SP was closing, plaintiff did not bid for that position at that time. Moreover, even if she had applied, she would not have received the position because another employee, Karen Johnson, had more seniority, and the CBA required defendant to award the position to the employee with the most seniority. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002) (a defendant/employer will ordinarily be entitled to summary judgment upon a showing that a requested accommodation conflicts with the rules of a seniority system, unless the plaintiff demonstrates special circumstances that make an exception to the seniority rule reasonable in that particular case). While plaintiff did not receive the position she may have preferred, defendant did place her in a position that met with all of her restrictions. Plaintiff has not identified any reason –

17

aside her from preference – why this new position was not a reasonable accommodation.

In June 2017, on her first day on the new job, plaintiff had an episode and found that she could not go onto the production floor. Defendant assigned plaintiff to a temporary desk job until she could obtain updated medical restrictions from her doctor. Plaintiff's updated medical restrictions barred her from entering the plant. Plaintiff again requested to be placed in the Service Technician position in 4SP. However, this position was no longer vacant. *See Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998) ("An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee." (internal citation omitted)). Furthermore, the 4SP position would have required plaintiff to enter the plant, which would have violated her updated medical restrictions. Thus, the Service Technician position in 4SP would not have been a reasonable accommodation.

Plaintiff met with HR and was told that they could not accommodate her, based on her new restriction barring her from entering the plant. Plaintiff agreed that this restriction was too restrictive and agreed that almost all union positions were located within the plant. Plaintiff stated that the only positions she was aware of that were not located inside the plant were research positions. She does not claim, or provide any evidence, that she was qualified to perform a research position, or that any research position was vacant. Plaintiff does not identify any vacant position where defendant

18

could have placed her, that would not have violated her medical restrictions. Plaintiff applied for, and was granted, a years-long S&A leave.

During her leave, plaintiff eventually obtained an updated restriction from her psychologist, permitting her to enter the plant, but not work directly on the production floor. While she was on leave, defendant continuously reached out to plaintiff, trying to find her a position that would accommodate her restrictions. Defendant was eventually able to place plaintiff in a position that complied with her restrictions. Given these undisputed facts, no reasonable jury could conclude that defendant failed to accommodate plaintiff's disability.

Plaintiff attempts to create a question of fact through the affidavit of Trent Briner, who states that he observed Scott Moore, a new hire, perform scrap inspector duties in 4SP. (DE # 36-3.) Plaintiff appears to cite this evidence in support of her position that defendant could have, but refused to, place plaintiff in that position. However, defendant submitted rebuttal evidence that Moore was simply training in 2018, so that he could occasionally fill in for Johnson when she was unavailable to perform her duties. (DE # 37-1.) Thus, there was no vacant position that plaintiff could have taken. Because defendant found a reasonable accommodation for plaintiff, her claim fails as a matter of law.

### 2.    Disparate Treatment

Plaintiff also claims that defendant discriminated against her by removing her from her scrap inspector duties, and placing Karen Johnson in the 4SP position, over

19

her. (DE # 36 at 8-10.) To succeed on an ADA discrimination claim, an employee must show three elements: "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by her disability." *Stelter v. Wisconsin Physicians Serv. Ins. Corp.*, 950 F.3d 488, 490 (7th Cir. 2020). To show that disability discrimination was the cause of the adverse job action, a plaintiff can either use direct or circumstantial evidence. *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). Circumstantial evidence may include evidence of suspicious timing, ambiguous statements or behavior toward other employees in the protected group, evidence that similarly situated employees outside of the protected group systematically received better treatment, and evidence that the employer offered a pretextual reason for an adverse job action. *Id.* Ultimately, the court must determine whether, considering the evidence as a whole, the evidence would permit a reasonable factfinder to conclude that plaintiff's disability was the cause of the adverse job action. *Id.*

There are several problems with plaintiff's claim regarding Karen Johnson's placement in the 4SP position. As discussed in an earlier section, plaintiff did not bid for that position when it was vacant, and even if she had, defendant was required to place Johnson in the position because she had more seniority. Furthermore, the 4SP position was not compatible with plaintiff's medical restrictions.

Curiously, plaintiff makes the argument that Martinez used plaintiff's disability as a pretext to give the position to Johnson because he is friends with her. (*Id.* at 6.) This

20

argument that favoritism was the true reason why defendant denied plaintiff the job she preferred cuts against her claim of disability discrimination.

More curious still is plaintiff's repeated suggestion that defendant shut down all of 2SP as part of a discriminatory scheme against plaintiff, in order to remove her from her position in 2SP. (*Id.* at 8-9.) There is no evidence in the record to support such a claim.

To the extent that plaintiff claims that her S&A leave was an adverse job action, this claim must fail. The undisputed evidence demonstrates that plaintiff applied for the leave after her medical restrictions made it impossible to find a position compatible with her restrictions. To the extent that plaintiff felt obligated to go on leave, it was due to her medical restrictions, not discrimination by defendant. Moreover, her leave served as a reasonable accommodation. An employer action cannot be both a reasonable accommodation *and* an adverse job action. *See Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019) ("We have trouble imagining how a demotion that qualifies as a reasonable accommodation *required* by the ADA can, at the same time, constitute disability discrimination or retaliation *prohibited* by the ADA." (emphasis in original)).

Reviewing the record as a whole, there is simply no evidence from which a reasonable jury could conclude that defendant took any adverse action against plaintiff because of her disability. Accordingly, defendant is entitled to judgment as a matter of law on this claim.

3.    Hostile Work Environment

Plaintiff makes an underdeveloped argument alleging that there is a question of material fact on her claim that Martinez harassed her based on her disability. (DE # 36 at 5.) It appears that plaintiff's claim of harassment is based off of: (1) Martinez's statement after the 2016 training when he called plaintiff "crazy;" and (2) his repeated threats to make plaintiff go back to work on the production floor.

A plaintiff may assert a claim for an illegal hostile work environment on the basis of disability under the ADA. *Ford*, 942 F.3d at 851-52. "The same standard governs hostile work environment claims under the ADA as under other employment discrimination laws." *Id.* at 856. "To survive summary judgment, plaintiffs must present evidence that: '(1) they were subject to unwelcome harassment; (2) the harassment was based on their [disability]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.'" *Id.* (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). "On the final prong, employers are strictly liable for harassment committed by supervisors." *Id.*

Defendant addresses Martinez's comments in the context of plaintiff's discrimination claim, arguing that Martinez's comments do not demonstrate pretext. (DE # 37 at 6-7.) However, while plaintiff's response brief is no model of clarity, it appears that plaintiff points to these comments by Martinez in support of a hostile work environment claim. Neither party adequately addresses this claim, but it is defendant

22

that bears the initial burden of persuasion for its motion for summary judgment. Defendant has not demonstrated (or even argued) that there is no question of fact on a claim of hostile work environment. Accordingly, the court will deny defendant's motion for summary judgment with respect to plaintiff's hostile work environment claim.

## IV.  CONCLUSION

For these reasons, the court **GRANTS in part** and **DENIES in part** defendant Arcelormittal USA, LLC's motion for summary judgment, on the terms identified in this Opinion and Order. (DE # 31.) The court **DENIES** plaintiff's motion to strike. (DE # 38.) The court **ORDERS** the parties to file a joint status report regarding their willingness to engage in a settlement conference before a Magistrate Judge by **March 19, 2021**. A trial date will be set under a separate order.

**SO ORDERED.**

Date: March 5, 2021

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT